**SEIFTS, et al., Plaintiffs,**

v.

**CONSUMER HEALTH SOLUTIONS LLC, et al., Defendants.**

**No. 05 Civ. 9355(ER).**

United States District Court, S.D. New York.

Signed Nov. 21, 2014.

---

1. Otsuka's Notice of Removal was filed here at 8:36 A.M.; plaintiff served Bristol–Myers at 10:05 A.M. that morning.

Brian Mark Culnan, Iseman, Cunningham, Riester and Hyde, LLP, Albany, NY, Christopher A. Smith, Scott P. Trivella, Seth Ptasiewicz, Trivella, Forte & Smith, LLP, White Plains, NY, for Plaintiffs.

William Kevin Kerrigan, Sr., MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, NY, for Defendants.

### OPINION AND ORDER

RAMOS, District Judge.

Before the Court is the Report and Recommendation ("R & R") dated March 6, 2014 of Magistrate Judge Lisa Margaret Smith, to whom this matter was referred for an inquest as to damages following default judgments against the Defendants. This action involves numerous plaintiffs, numerous defendants, and assorted causes of action under federal and state law. Accordingly, in the R & R, Judge Smith recommends damages of varying amounts for and against the different parties. For the reasons stated herein, the Court ADOPTS the R & R and directs the entry of judgment as recommended.

### I. Background

Plaintiffs Jeffrey C. Seifts, Ellen Manfredo, Charles Hargreaves, Selma Denmark, Peter Audet, Carolyn DeMichelle, Susan E. Hoyt, Maryann Pulvirenti, Joseph French, Linford Snyder, Diane Berman, John Bastone, and John Gerson, individually and on behalf of the participants of the Fleetcare CU 1000P Medical Program, John and Jane Does 1–300, Jeffrey C. Seifts & Co., Inc., and Consumer Advocates Group, Ltd. ("CAG") (collectively, "Plaintiffs"), commenced this action on November 3, 2005 against Consumer Health Solutions LLC d/b/a Palmetto Administrators ("CHS"), Fleetcare Group, LLC, Fleet Care Corporation, Bart Posey, TIG Premier Insurance Company, William M. Worthy, II, Angela Posey, Obed Kirkpatrick, Jollene Priester, Jack Henson Hawkins, and New Source Benefits, LLC, individually and jointly and severally (col-

lectively, "Defendants").[1] Plaintiffs assert claims for breach of fiduciary duty and disclosure obligations under ERISA, claims for recovery of the value of wrongly denied benefits, and a series of claims under New York law.

Initially assigned to the Honorable Stephen C. Robinson, the case was transferred to the Honorable Richard J. Holwell on November 12, 2010, Doc. 62, to the Honorable J. Paul Oetken on October 20, 2011, Doc. 83, and to the undersigned on July 22, 2013. Doc. 148. The case was referred to the Honorable Lisa Margaret Smith, United States Magistrate Judge, on November 14, 2011. Doc. 84.

On May 6, 2011, Judge Holwell entered a default judgment in favor of Plaintiffs Ellen Manfredo, Charles Hargreaves, Selma Denmark, Peter Audet, Carolyn DeMichelle, Susan E. Hoyt, Maryann Pulvirenti, Joseph French, Linford Snyder, Diane Berman, John Bastone, and John Gerson (the "Individual Plaintiffs") and against Defendants CHS, Fleetcare Group, LLC, Fleet Care Corporation, Bart Posey, William M. Worthy, II, Angela Posey, Obed Kirkpatrick, Jollene Priester, Jack Henson Hawkins, and New Source Benefits, LLC. Doc. 80. On March 15, 2012, Judge Oetken entered a default judgment in favor of Plaintiffs Jeffrey C. Seifts, Jeffrey C. Seifts & Co., Inc., and CAG (the "Seifts Plaintiffs") and against Defendants CHS, Fleetcare Group, LLC, Fleet Care Corporation, Bart Posey, William M. Worthy, II, Angela Posey, Obed Kirkpatrick, Jack Henson Hawkins, and New Source Benefits, LLC, jointly and severally. Doc. 102. Both Judge Holwell and Judge Oetken referred the issue of the amount of damages to which the Individual Plaintiffs and Seifts Plaintiffs may be entitled to Judge Smith for an inquest or hearing on damages. Doc. 80; Doc. 84; Doc. 102.

On March 6, 2013, Judge Smith issued her R & R, concluding that a judgment for damages should be entered as follows:

- $128,821.73 to CAG from Defendants FleetCare Group LLC, Fleet Care Corporation, CHS, Worthy, Bart Posey, Angela Posey, and Kirkpatrick;
- $3,348.75 to Manfredo from Defendant FleetCare Group LLC;
- $3,794.28 to Audet from Defendant FleetCare Group LLC;
- $1,180 to Hoyt from Defendant FleetCare Group LLC;
- $5,886.09 to Pulvirenti from Defendant FleetCare Group LLC;
- $6,975 to French from Defendant FleetCare Group LLC; and
- $10,583.34 to Bastone from Defendant FleetCare Group LLC.

R & R 334–35. Judge Smith declined to recommend an award of attorneys' fees to the Seifts Plaintiffs but invited them to argue their claim to such fees in any objections to the R & R. The Seifts Plaintiffs filed no objections. *Id.* at 335. Conversely, Judge Smith concluded that the Individual Plaintiffs would be entitled to an attorneys' fees awarded as provided for in § 349 of the New York General Business Law and noted that this Court might refer the case back to her for a determination of any application by those Plaintiffs for attorneys' fees. *Id.* No such application has been filed as of yet. *Id.*

The R & R noted that objections, if any, would be due by March 24, 2014 and that failure to timely object would preclude la-

---

**1.** TIG Premier Insurance Company was terminated as a defendant, Doc. 147, based on the Court's grant of its motion to dismiss and/or for summary judgment. Doc. 81. Jollene Priester was terminated as a defendant following the Parties' stipulation of voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Doc. 167.

ter appellate review of any order of judgment entered. *Id.* at 335. Neither the Seifts Plaintiffs, nor the Individual Plaintiffs, nor the Defendants filed objections. They have therefore waived their right to object to the R & R. *See Dow Jones & Co. v. Real–Time Analysis & News, Ltd.,* No. 14 Civ. 131(JMF)(GWG), 2014 WL 5002092, at *1 (S.D.N.Y. Oct. 7, 2014) (citing *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Caidor v. Onondaga County,* 517 F.3d 601, 604 (2d Cir.2008)).

## II. *Standard of Review*

■ A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise "specific," "written" objections to the report and recommendation "[w]ithin fourteen days after being served with a copy." *Id.; see also* Fed.R.Civ.P. 72(b)(2). A district court reviews *de novo* those portions of the report and recommendation to which timely and specific objections are made. 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile (95–CR–1074),* 121 F.3d 34, 38 (2d Cir.1997). The district court may adopt those parts of the report and recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record. *Lewis v. Zon,* 573 F.Supp.2d 804, 811 (S.D.N.Y.2008). The district court will also review the report and recommendation for clear error where a party's objections are "merely perfunctory responses" argued in an attempt to "engage the district court in a rehashing of the same arguments set forth in the original petition." *Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) (citations and internal quotation marks omitted).

## III. *Conclusion*

No party has objected to the R & R. The Court has reviewed Judge Smith's thorough R & R and finds no error, clear or otherwise. Judge Smith reached her determination on damages after a careful review of the parties' submissions. R & R 311–12. The Court therefore ADOPTS Judge Smith's recommended judgment regarding damages for the reasons stated in the R & R and REFERS back to Judge Smith future applications, if any are filed, for attorneys' fees with regard to the Individual Plaintiffs.

The parties' failure to file written objections precludes appellate review of this decision. *PSG Poker, LLC v. DeRosa–Grund,* No. 06 CIV. 1104(DLC), 2008 WL 3852051, at *3 (S.D.N.Y. Aug. 15, 2008) (citing *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997)).

It is SO ORDERED.

## *REPORT AND RECOMMENDATION*

LISA MARGARET SMITH, United States Magistrate Judge.

Plaintiffs Jeffrey C. Seifts, Ellen Manfredo, Charles Hargreaves, Selma Denmark, Peter Audet, Carolyn DeMichelle, Susan E. Hoyt, Maryann Pulvirenti, Joseph French, Linford Snyder, Diane Berman, John Bastone, John Gerson, individually and on behalf of the participants of the Fleetcare CU 1000P Medical Program, John and Jane Does 1–300, and Jeffrey C. Seifts and Co., Inc. and Consumer Advocates Group, Ltd. commenced this action against Defendants Consumer Health Solutions LLC d/b/a Palmetto Administrators, Fleetcare Group, LLC, Fleet Care Corporation, Bart Posey, TIG Premier Insurance Company [1], William M. Worthy,

---

1. Based on the Court's grant of TIG's motion

to dismiss and/or for summary judgment,

II, Angela Posey, Obed Kirkpatrick, Jollene Priester, Jack Henson Hawkins, and New Source Benefits, LLC, individually and jointly and severally, asserting claims for breach of their fiduciary duties and their disclosure obligations under ERISA and to recover the value of benefits wrongly denied by Defendants. Plaintiffs also assert claims under New York law for breach of contract, breach of implied contract, quantum meruit, unjust enrichment, conversion, negligence and negligent misrepresentation, fraud and intentional misrepresentation, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, intentional infliction of emotional distress, and violations of New York Insurance Law and New York General Business Law provisions.

On May 6, 2011, the Honorable Richard J. Holwell entered a default judgment in favor of Plaintiffs Ellen Manfredo, Charles Hargreaves, Selma Denmark, Peter Audet, Carolyn DeMichelle, Susan E. Hoyt, Maryann Pulvirenti, Joseph French, Linford Snyder, Diane Berman, John Bastone, and John Gerson (the "Individual Plaintiffs") and against Defendants Consumer Health Solutions, LLC d/b/a Palmetto Administrators, Fleetcare Group, LLC, Fleet Care Corporation, Bart Posey, William M. Worthy, II, Angela Posey, Obed Kirkpatrick, Jollene Priester, Jack Henson Hawkins and New Source Benefits, LLC. Docket # 80. The issue of the amount of damages to which the Individual Plaintiffs may be entitled was referred to the undersigned for an inquest/hearing on damages. *Id.; see also* Docket # 84. On March 15, 2012, the Honorable J. Paul Oetken entered a

default judgment in favor of Plaintiffs Jeffrey C. Seifts, Jeffrey C. Seifts & Co., Inc., and Consumers Advocates Group, Ltd. (the "Seifts Plaintiffs"), and against Defendants Consumer Health Solutions, LLC d/b/a Palmetto Administrators, Fleetcare Group, LLC, Fleet Care Corporation, Bart Posey, William M. Worthy, II, Angela Posey, Obed Kirkpatrick, Jack Henson Hawkins and New Source Benefits, LLC, jointly and severally. Docket # 102.[2] Judge Oetken likewise referred the issue of the amount of damages to which the Seifts Plaintiffs may be entitled to the undersigned for an inquest/hearing on damages. *Id.*

On March 26, 2012, the Seifts Plaintiffs and the Individual Plaintiffs filed their affidavits in support of their requested damages. Docket ## 107–115.[3] Thereafter, Defendants Jollene Priester and Jack Hawkins filed separate motions to vacate the default judgment, Docket ## 118, 135. In the interim, Defendant Priester filed an opposition to the Individual Plaintiffs' submissions in support of their requested damages. Docket # 122, On July 31, 2012, Judge Oetken denied the motions to vacate the default judgment. Docket # 142. On August 6, 2012, the Court granted all other Defendants until September 4, 2012, to serve and file affidavits in opposition to the Seifts Plaintiffs' and the Individual Plaintiffs' requests for damages. Docket # 144. None of the other Defendants has filed any submission in opposition to· the requests for damages.

Upon review, the Court found that the submissions from the Seifts Plaintiffs and the Individual Plaintiffs in support of their

---

Docket # 81, it was terminated as a defendant. Docket # 147.

**2.** Defendant Priester settled with the Seifts Plaintiffs, Docket # 99, but she has not settled with the Individual Plaintiffs, Docket # 103.

**3.** The Seifts Plaintiffs requested, and were granted, an extension of time until April 25, 2012, to make a further submission in support of their request for damages, Docket # 117, but no additional submission has been filed with the Court.

requested damages were deficient, and on July 24, 2013, the undersigned issued an Order (the "July 24 Order"), stating:

> [F]or each claim upon which either the Seifts Plaintiffs or the Individual Plaintiffs, or both, seek relief, those Plaintiffs shall ... provide the Court with legal authority which states the elements of the claim, and then shall show how the facts deemed admitted in the First Amended Complaint satisfy those elements.
>
> In addition, neither the Seifts Plaintiffs nor the Individual Plaintiffs have provided any legal support whatsoever for the amount and type of damages being sought. Accordingly, with respect to the damages being sought on each claim for which either the Seifts Plaintiffs or the Individual Plaintiffs, or both, intend to establish liability, those Plaintiffs shall provide legal authority, i.e., citations to case law, in support of the damages being sought and the manner of calculating damages. In other words, all Plaintiffs should link their proposed damages figures to their established legal claims.

Docket # 147 at 5 (footnote omitted). The Individual Plaintiffs filed their supplemental submissions on September 20, 2013, Docket ## 156–62. The Seifts Plaintiffs have filed nothing in response to the Court's July 24 Order.

For the reasons that follow, 1 conclude, and respectfully recommend that Your Honor should conclude, that a judgment should be entered awarding damages as set forth below.

### BACKGROUND [4]

Individual plaintiff Jeffrey C. Seifts ("J. Seifts") is the owner of corporate plaintiffs J.C. Seifts and Co., Inc. and Consumer Advocates Group, Ltd. ("CAG"). All of the other individual plaintiffs—Ellen Manfredo, Charles Hargreaves, Selma Denmark, Peter Audet, Carolyn DeMichelle, Susan E. Hoyt, Maryann Pulvirenti, Joseph French, Linford Snyder, Diane Berman, John Bastone, and John Gerson (the "Individual Plaintiffs")—were members of CAG. Both J. Seifts and the Individual Plaintiffs enrolled in a medical insurance plan, FleetCare CU 1000P Medical Program ("FleetCare Plan"), and paid premiums, in exchange for which they expected to receive health care benefits. However, Plaintiffs were unlawfully denied benefits by the Defendants.

The history of these claims is as follows:

In the late summer or early fall of 2004, J. Seifts, on behalf of CAG, contacted Defendant FleetCare Group LLC ("FleetCare Group" or "FleetCare LLC") regarding the purchase of health insurance coverage for an association. J. Seifts wanted to find coverage for CAG members that would provide medical indemnity coverage and hospitalization coverage, i.e., coverage for office visits, laboratory testing services, doctors' services, hospital professional services, and related ancillary medical services, at a reasonable premium. J. Seifts had several telephone conversations as well as in-person meetings with individual defendants Bart Posey and Obed Kirkpatrick, who were acting as agents of FleetCare Group, and came to an agreement with respect to an insurance plan for CAG members. Final agreement on all material terms of the FleetCare Plan was reached on October 15, 2004. The Individual Plaintiffs, who decided to participate in the FleetCare Plan, filled out application forms and tendered premium payments. The effective start date of

---

**4.** All facts are taken from the First Amended Complaint, Docket # 17.

the FleetCare Plan was November 1, 2004.

During November and December, 2004, eligible claims for health care benefits were not paid or were paid in error. When the Individual Plaintiffs' medical claims were not paid, the Individual Plaintiffs received collection notices from their health care providers and were unable to obtain the medical care that they needed. Plaintiffs contacted Defendants to try to correct the situation, but claims payment problems persisted. When prompted by J. Seifts to pay outstanding medical claims, Defendant Consumer Health Solutions LLC d/b/a Palmetto Administrators, the third-party administrator for the Fleet-Care Plan, issued several checks to health care providers, but they were all returned for insufficient funds. In late spring or early summer of 2005, some Defendants began telling CAG members and health care providers seeking payment that the FleetCare Plan was self-funded, knowing that such statements were incorrect and misleading, in order to divert attention from their failure to pay claims and their conversion of premiums and to destroy the business relationships between and among J. Seifts, J.C. Seifts and Co., CAG, and the Individual Plaintiffs.

After a period of months, Plaintiffs realized that any further attempts to have Defendants pay their medical claims would be useless. Defendants were refusing to pay the claims, were ignoring the claims, and were using the premium payments for purposes other than the provision of medical benefits to FleetCare Plan participants.

On November 3, 2005, Plaintiffs commenced this action. Docket # 1. On March 10, 2006, Plaintiffs filed a First Amended Complaint. Docket # 17. The First Amended Complaint contains 14

claims asserted against all Defendants, unless otherwise noted: violation of ERISA, 29 U.S.C. §§ 406[5] & 1132, resulting from Defendants' breach of fiduciary duty in failing to pay Plaintiffs' benefits claims (against all Defendants except TIG); conversion (of Plaintiffs' premiums); negligence and negligent misrepresentation; quantum meruit; fraud and intentional misrepresentation; breach of contract; tortious interference with business relations of J. Seifts, J.C. Seifts and Co., and CAG (against all Defendants except TIG); unjust enrichment; breach of implied contract; breach of the covenant of good faith and fair dealing (against all Defendants except TIG); breach of common law fiduciary duty (against all Defendants except TIG); intentional infliction of emotional distress (against all Defendants except TIG); violation of New York Insurance Law § 3224–a, the "prompt pay" law; and violation of New York General Business Law § 349.

As noted above, on May 6, 2011, a default judgment was entered in favor of the Individual Plaintiffs, Docket # 80, and on March 15, 2012, a default judgment was entered in favor of the Seifts Plaintiffs. Docket # 102.

## DISCUSSION

■ Upon the default of a party, a court must accept as true all factual allegations in the complaint, except those relating to damages, and a plaintiff is entitled to all reasonable inferences from the evidence offered, but the court nonetheless has discretion to decide whether the facts set forth in the complaint state a valid claim. *See, e.g., Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981); *see also, e.g., Gov't Emps. Ins. Co. v. AMD Chiropractic, P.C.*, No. 12–cv–4295, 2013

---

**5.** Although Plaintiffs cite to 29 U.S.C. § 406, there is no such statutory provision.

WL 5131057, at *3 (E.D.N.Y. Sept. 12, 2013) ("The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action.") (citation omitted); *Nwagboli v. Teamwork Transp. Corp.*, No. 08 Civ. 4562, 2009 WL 4797777, at *2 (S.D.N.Y. Dec. 7, 2009) ("When assessing the propriety of a damages award after a judgment by default is entered, a court must be satisfied initially that the allegations of the complaint are well-pleaded.") (internal quotation marks and citation omitted). "If the allegations are well-pleaded, or, in other words, establish liability for a claim, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible to mathematical computation." *Nwagboli*, 2009 WL 4797777, at *2 (internal quotation marks, alteration, and citation omitted).

█ In determining the amount of damages to be awarded, "under FRCP 55(b)(2), 'it [is] not necessary for the District Court to hold a hearing, as long as it [has] ensured that there [is] a basis for the damages specified in the default judgment.'" *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir.1997) (quoting *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir.1989)). "On an inquest

for damages following a default, plaintiff bears the burden of proof and must introduce sufficient evidence to establish the amount of damages with reasonable certainty." *RGI Brands LLC v. Cognac Brisset–Aurige, S.a.r.l.*, No. 12 Civ. 1369, 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013) (collecting cases), *adopted by*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013).

The difficulty in this case is that there are two sets of Plaintiffs with different, and arguably conflicting, interests, as well as different interactions and/or relationships with the Defendants.[6] The First Amended Complaint is entirely vague with respect to the ongoing relationship between the corporate Seifts Plaintiffs and the Defendants. Thus, although the First Amended Complaint explains how the corporate Seifts Plaintiffs (with J. Seifts acting as their agent) acted as intermediaries with respect to the creation of the Fleet-Care Plan, it is unclear what kind of relationship existed between the corporate Seifts Plaintiffs and the Defendants, or what ongoing duties were owed to the corporate Seifts Plaintiffs by the Defendants, once the Plan was established.

Likewise, the relationship between the Seifts Plaintiffs and the Individual Plaintiffs is unclear. Although the First Amended Complaint alleges that "Seifts was seeking an insurance solution that he could offer to CAG members," *id.* ¶ 50, and all of the Individual Plaintiffs were CAG members, *id.* ¶¶ 4–14, there are no allegations concerning the duties owed by CAG to its members. Thus, to the extent that premium binder payments and/or premium payments from the Individual Plaintiffs to

---

6. Jeffrey C. Seifts, who is grouped with the Seifts Plaintiffs, is suing in both his individual capacity, having himself enrolled as a participant in the FleetCare Plan, *see* First Am. Compl. ¶ 15, and as the owner of corporate plaintiffs J.C. Seifts and Co., Inc. and Con-

sumer Advocates Group, Ltd. *Id.* ¶¶ 2–3. In this inquest proceeding, however, he does not seek to recover damages that he incurred as a participant in the FleetCare Plan. *See* Affidavit of Jeffrey C. Seifts, Docket # 115.

FleetCare Group were tunneled through CAG, *see id.* ¶¶ 63 & 67; *see also* Seifts Decl. (Docket # 160) ¶ 2 ("The premiums that the individual Plaintiffs tendered were paid to the Defendants by my firms for the health insurance that the Defendants promised would be provided in return for those premiums."), the Court cannot award the amount of such payments as damages to both sets of Plaintiffs. Rather, there can only be a single recovery from the Defendants. As the Court noted in its July 24 Order, "The Court takes no position regarding any remedies that the Individual Plaintiffs might have against the Seifts Plaintiffs."

Finally, the Court's ability to parse out the well-pleaded allegations in the First Amended Complaint has been complicated by the fact that many allegations refer simply to "plaintiffs" or "defendants," leaving the Court to determine which allegations are specific to which Plaintiffs and which of the Defendants is involved in which of the specific acts of misconduct alleged.

Despite the lack of clarity, which prompted the Court to issue its July 24 Order, the Court will proceed to address the merits of the Seifts Plaintiffs' and Individual Plaintiffs' damages applications.

## A. *The Seifts Plaintiffs*

The Seifts Plaintiffs have not responded to the Court's July 24 Order, which directed all Plaintiffs to submit a statement as to the claims in the First Amended Complaint upon which they seek relief, including the provision of legal authority stating the elements of each such claim and an explanation of how the facts deemed admitted in the First Amended Complaint satisfy those elements. Furthermore, the July 24 Order directed all Plaintiffs to provide legal support for the amount and type of damages being sought, as well as the manner of calculating damages, including citations to case law. Because the Seifts Plaintiffs have submitted nothing, the Court is left to base its decision on their earlier submission, which consists of an affidavit from J. Seifts ("Seifts Aff."), Docket # 115.

## *The Adequacy of the Seifts Plaintiffs' Pleaded Claims*

The Seifts affidavit lists the various causes of action asserted in the First Amended Complaint (conversion, breach of fiduciary duty, negligent and fraudulent misrepresentation, breach of contract, tortious interference with business relations, unjust enrichment, and violations of ERISA and § 349 of the New York General Business Law), without explaining how the factual allegations in that pleading satisfy the elements of each of those claims or correlating the factual allegations in that pleading to the amount of damages sought to be recovered. However, in the section of his affidavit entitled, "Damages," J. Seifts asserts that "defendants converted sums that CAG forwarded to them in connection with the establishment and administration of the CAG health plan." Seifts Aff. ¶ 13. Accordingly, the Court assumes that the Seifts Plaintiffs are seeking relief as a result of unspecified defendants' conversion of the money sent to FleetCare Group, as alleged in the First Amended Complaint.[7]

---

7. On October 27, 2004, CAG tendered a check in the amount of $33,606.93, made payable to FleetCare Group. On October 27, 2004, CAG tendered a check in the amount of $1,321.77, made payable to FleetCare Group. On December 1, 2004, CAG tendered a check in the amount of $32,108.68, made payable to FleetCare Group. On December 28, 2004, CAG tendered a check in the amount of $30,574.34, made payable to FleetCare Group. On February 4, 2006[sic], CAG tendered a check in the amount of $31,210.01,

■ "Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir.1997) (internal quotation marks and citation omitted). "[I]t is well-settled that an action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question." *Id.* at 41–42 (internal quotation marks and citation omitted). "The tort of conversion does not require defendant's knowledge that he [or she] is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *Id.* at 42 (internal quotation marks and citation omitted).

■ As J. Seifts explained in his affidavit, and as alleged in the First Amended Complaint, after filling out application forms and tendering binder checks and premium payments, throughout November and December, 2004, Plan participants' claims were not paid or were paid in error. First Am. Compl. ¶ 76; Seifts Aff. ¶ 5. According to J. Seifts, "defendants were either refusing to pay the claims or simply ignoring them, and moneys forwarded to them were being converted to use for purposes other than to provide medical benefits to the CAG participants." Seifts Aff. ¶ 9.

■ "Plaintiffs who bring conversion claims against multiple defendants are not required to specify in their complaint which defendant received, has possession of the funds, or which of them has or had the power to return the funds. They are required, however, to indicate clearly the defendants against whom relief is sought and the basis upon which the relief is sought against the particular defendants. In other words, they must show that each individual defendant played some role in the conversion." *Segal v. Bitar*, No. 11 Civ. 4521, 2012 WL 273609, at *9 (S.D.N.Y. Jan. 30, 2012) (internal quotation marks, alteration, and citations omitted). In this case, the allegations in the First Amended Complaint do not establish that each of the defendants played some role in the conversion of the funds sent to FleetCare Group by CAG. Thus, all Plaintiffs allege that (1) the CAG checks were made payable to FleetCare Group and were deposited into a FleetCare Group bank account, First Am. Compl. ¶ 67; (2) the premiums paid by CAG, deposited into the general operating accounts of FleetCare LLC [8] were "later converted to the general operating account of FleetCare Corp., or were deposited or otherwise transferred to the general operating account of CHS [Consumer Health Solutions LLC]," *id.* ¶ 77; and (3) "such funds were ... converted by the individual defendants, Worthy, Hawkins, Priester, Kirkpatrick, Posey, and Angie Posey for their own personal use and enjoyment." *Id.*

There are therefore sufficient allegations to show that corporate defendants FleetCare Group LLC, FleetCare Corporation, and Consumer Health Solutions

---

made payable to FleetCare Group. On March 7, 2005, CAG tendered a check in the amount of $33,441.45, made payable to FleetCare. Plaintiff CAG bank records show that each check was accepted and deposited into Prime Trust Bank, 064108764, Nashville, Tennessee, For Deposit Only, FleetCare Group LLC, 050030601.

First Am. Compl. ¶ 67.

8. Plaintiffs interchangeably refer to Defendant FleetCare Group LLC as either FleetCare Group or FleetCare LLC.

LLC ("CHS") played some role in the conversion of the checks from CAG. However, there are no allegations in the First Amended Complaint showing that the remaining corporate defendant, New Source Benefits LLC, played any role at all in the conversion of the checks from CAG. Accordingly, the Seifts Plaintiffs cannot recover from New Source Benefits LLC on their conversion claim.

"It has long been established that a corporate officer who commits or participates in a tort, even if it is in the course of his [or her] duties on behalf of the corporation, may be held individually liable." *Lo-Presti*, 126 F.3d at 42 (internal quotation marks and alterations omitted). With respect to Worthy, the First Amended Complaint alleges that he "is an officer and shareholder, or otherwise has an ownership interest in FleetCare Corp." First Am. Compl. ¶ 19. It is further alleged that "the assets of FleetCare LLC, including the premiums paid by Plaintiffs, were transferred or otherwise converted to FleetCare Corp. before or about late April 2005, under the direction of Worthy and Defendant Bart Posey." *Id.* ¶ 20. With respect to Posey, the First Amended Complaint alleges that he "owned a one-half interest in FleetCare LLP [9]," and "held himself out to the public and to the Plaintiffs as the President of FleetCare LLP." *Id.* ¶ 23. In addition, Posey is "an officer and shareholder, or otherwise has an ownership interest in FleetCare Corp." *Id.* The First Amended Complaint also alleges that Angela Posey, Bart Posey's wife, "is an officer and shareholder, or otherwise has an ownership interest in FleetCare Corp." *Id.* ¶ 27. The same allegation is made with respect to Kirkpatrick. *Id.*

¶ 31. Thus, the Seifts Plaintiffs have stated a claim for conversion against Worthy, Bart Posey, Angela Posey, and Kirkpatrick. However, there are no allegations that Hawkins was either an officer or shareholder or otherwise had an ownership interest in either FleetCare Group LLC, FleetCare Corporation, or CHS, the three corporate entities alleged to have converted the checks from CAG, nor have Plaintiffs pled sufficient facts to establish a plausible inference that Hawkins "played some role" in the conversion. There are no allegations that Hawkins had access to the accounts of FleetCare Group LLC, FleetCare Corporation, or CHS so as to be able to exercise dominion or control over the CAG funds. Consequently, the Seifts Plaintiffs cannot recover from Hawkins on their conversion claim.[10]

In sum, the Seifts Plaintiffs have succeeded in stating a claim for conversion upon which they may recover damages against Defendants FleetCare Group LLC, FleetCare Corporation, CHS, Worthy, Bart Posey, Angela Posey, and Kirkpatrick.

### The Adequacy of the Seifts Plaintiffs' Submission in Support of Damages

▇ "A plaintiff who prevails on a conversion claim may recover the value of the property at the time and place of conversion, plus interest." *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, No. 10–CV–1762, 2013 WL 1822288, at *10 (E.D.N.Y. Apr. 30, 2013) (internal quotation marks and citations omitted). The Seifts Plaintiffs have provided sufficient proof of the amounts which CAG sent to FleetCare Group in connection with the creation and

---

9. The Court assumes that "FleetCare LLP" is an erroneous reference to "FleetCare LLC." "FleetCare LLP" is nowhere identified in the First Amended Complaint.

10. The Court does not consider Priester's liability since, as stated in footnote 2, *supra*, she settled with the Seifts Plaintiffs.

administration of the CAG health plan. Attached to the Seifts affidavit are copies of the cashed checks made payable to FleetCare Group (one is made payable to FleetCare) by CAG. *See* Seifts Aff., Ex. A. These checks evidence payment of the following amounts: $33,606.93 on October 27, 2004; $1,321.77 on October 27, 2004 [11]; $32,108.68 on December 1, 2004; $30,574.34 on December 28, 2004; and $31,210.01 on February 4, 2005—a total of $128,821.73. *Id.* Although the Seifts Plaintiffs submit this evidence in support of an award of damages to all of them, this evidence only supports an award of damages to CAG.

 Moreover, to the extent that the Seifts Plaintiffs seek "interest at the legal rate from November 3, 2005," the date on which this action was commenced, Seifts Aff. at 6, they are not entitled to recover prejudgment interest on their conversion claim because it was not requested in either the body of the First Amended Complaint or in the *ad damnum* clause. Pursuant to Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Accordingly, I conclude and respectfully recommend that Your Honor should conclude, that the Seifts Plaintiffs' application for prejudgment interest should be denied.[12] *See Pacific M. Int'l Corp. v. Raman Int'l Gems, Ltd.,* 888 F.Supp.2d 385, 401 (S.D.N.Y.2012) (denying plaintiffs application for prejudgment

interest on conversion claim in context of default by defendant where plaintiff "neither requested prejudgment interest in the body of the Complaint nor in the *ad damnum* clause").[13]

 The Seifts affidavit also states that as a result of Defendants' wrongdoing, J. Seifts and CAG "were forced to provide sums to directly pay medical claims that were being submitted from CAG plan participants" estimated to total $120,000. Seifts Aff. ¶ 14. The Seifts Plaintiffs do not explain under which legal claim they seek to recover these damages. In any event, they have been unable to provide the Court with any bank records evidencing the exact amount of these payments. "A plaintiff's statement as to the amount of damages alone does not provide the requisite reasonable certainty." *RGI Brands LLC,* 2013 WL 1668206, at *6 (collecting cases). Accordingly, even if the Seifts Plaintiffs (more particularly, J. Seifts and/or CAG) were entitled to recover this money pursuant to one of the claims asserted in the First Amended Complaint, the Court does not have sufficient evidence to include such amount in its award of damages.

Accordingly, based on the evidence presented to the Court, I conclude, and respectfully recommend that Your Honor should conclude, that CAG—the only Seifts Plaintiff for which sufficient evidence of damages has been submitted—

---

11. In contrast to the copy of the check provided to the Court in Exhibit A, the Seifts Affidavit lists a check for $1,332.77 dated October 17, 2004. *See* Seifts Aff. ¶ 13.

12. In any event, only CAG would be able to seek prejudgment interest, since it is the only Seifts Plaintiffs that has established its entitlement to damages.

13. Like the complaint in *Pacific M. Int'l Corp. v. Raman Int'l Gems, Ltd.,* the First Amended

Complaint in this case only references interest in its invocation of the Court's subject matter jurisdiction: "Jurisdiction of this Court is invoked on the basis of diversity of the parties pursuant to 28 U.S.C. § 1332(a). The matter in controversy exceeds, exclusive of interests [sic] and costs, the sum of One Hundred Thousand ($ 100,000.00) Dollars." First Am. Compl. ¶ 40; *see Pacific M. Int'l Corp.,* 888 F.Supp.2d at 401 n. 11.

should be awarded damages in the amount of $128,821.73.

### Attorneys' Fees

In addition, the Seifts affidavit states, "I am ... advised by our attorneys that ERISA and the New York General Business Law provide prevailing parties asserting claims under those statutes with the right to receive their reasonable attorneys' fees and disbursements." Seifts Aff. ¶ 12, However, as noted above, the Seifts Plaintiffs failed to submit anything to the Court in response to the July 24 Order explaining how the factual allegations in the First Amended Complaint satisfy the elements of a claim under either ERISA or the New York General Business Law or providing legal support for the recovery of damages under either statute. Thus, the Court is left to conclude that the Seifts Plaintiffs have abandoned recovery of damages based on these legal claims. To the extent that the Seifts Plaintiffs seek to recover attorneys' fees based on claims asserted under either ERISA or the New York General Business Law, they may include in any objections to this Report and Recommendation that they might file an explanation of how the factual allegations in the First Amended Complaint satisfy the elements of a claim under either ERISA or the New York General Business Law. If Your Honor determines that the Seifts Plaintiffs have satisfied their burden of establishing the liability of any of the defendants under either statute to them (as opposed to the Individual Plaintiffs), then you may refer the case back to the undersigned to decide the issue of attorneys' fees.

### B. *The Individual Plaintiffs*
### *The Adequacy of the Individual Plaintiffs' Pleaded Claims*

In their Supplemental Memorandum of Law, submitted in response to the Court's July 24 Order, the Individual Plaintiffs set forth the claims upon which they base their request for damages. Docket # 162. The Individual Plaintiffs premise their recovery of damages on their New York state law claims for conversion (second cause of action), quantum meruit/unjust enrichment (fourth and eighth causes of action), fraud (fifth cause of action), breach of contract (sixth cause of action), breach of implied contract (ninth cause of action), breach of the covenant of good faith and fair dealing (tenth cause of action), intentional infliction of emotional distress (twelfth cause of action), violation of New York Insurance Law § 3224–a ("The Prompt Pay Law") (thirteenth cause of action), and deceptive trade practices under New York General Business Law § 349 (fourteenth cause of action). *See id.*[14] The Court addresses each of these claims and whether the well-pleaded allegations in the First Amended Complaint establish Defendants' liability sufficiently to support an award of damages. As mentioned above, however, the Court's task has been complicated by the fact that the claims in the First Amended Complaint are asserted by all "plaintiffs" against all "defendants," thereby requiring the Court to examine all of the factual allegations to determine which are specific to the Individual Plaintiffs and which of the Defendants is involved in the misconduct alleged in each of the claims. The Individual Plaintiffs' Supplemental Memorandum of Law does nothing to clarify matters, refer-

---

**14.** The Court assumes that the Individual Plaintiffs have chosen not to premise their recovery of damages upon their claims for violation of ERISA (first cause of action), neg-

ligence and negligent misrepresentation (third cause of action), or breach of common law fiduciary duty (eleventh cause of action).

ring throughout to unspecified "Defendants."

### Breach of Contract

■ "Under New York law, a breach of contract action requires proof of: (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Nwagboli,* 2009 WL 4797777, at *3 (internal quotation marks, citation, and footnote omitted). In the First Amended Complaint, the "plaintiffs," *i.e.,* both the Seifts Plaintiffs and the Individual Plaintiffs, allege that "[o]n or about October 15, 2004, the defendants and plaintiffs reached agreement on all material terms and entered into a binding contractual relationship to provide to the plaintiffs health insurance services and benefits," First Am. Compl. ¶ 121, and the "plaintiffs accepted those services and tendered premium payments to the defendants." *Id.* ¶ 122.

■ More specifically, elsewhere in the First Amended Complaint, they allege that there was an "agreement of all material terms between FleetCare [15] and Seifts and Co., CAG, and the plaintiffs/Plan participants," which was "verified and substantiated by written documents: (a) brochures describing the Plan and the completed benefits schedule; (b) applications for medical insurance coverage signed by the individual plaintiffs, and (c) checks for premium payments tendered by the individual plaintiffs, accepted and deposited by defendants Worthy, CHS/Palmetto and FleetCare." *Id.* ¶ 62. The alleged effective start date for the Plan was November 1, 2004, *id.* ¶ 67, but, according to the First Amended Complaint, "[d]uring November and December 2004, eligible claims for healthcare benefits, properly submitted to the Palmetto by the Plan participants, were not paid, or were paid in err [sic]." *Id.* ¶ 76. In addition, the "healthcare cards provided by CHS/Palmetto were not accepted by CAG member healthcare providers or were found to be burdensome and confusing. As a result medical claims were not paid, paid in err [sic], and medical services were denied." *Id.* ¶ 78. Consequently, "[w]hen the medical claims were not being paid by CHS/Palmetto [16] and/or FleetCare LLC, as previously represented and as agreed," "all plaintiffs were damaged": "the plaintiffs received collection notices from the healthcare providers"; the "credit ratings of the plaintiffs were adversely affected"; the "business operations of certain plaintiffs were seriously disrupted and damaged"; and Plaintiffs "were prevented from seeing their physicians as claims went unpaid." *Id.* ¶¶ 79–80.

Although the factual allegations, accepted as true, state a claim by the Individual Plaintiffs for breach of contract, the allegations concerning the existence of a contract do not establish a contractual rela-

---

**15.** "FleetCare" refers to FleetCare Group LLC. *See* First Am. Compl. ¶ 21 ("FleetCare LLC contracted with the Plaintiffs and other participants to provide medical/health insurance coverage under the Plan."). Moreover, FleetCare Corporation did not exist at the time that the contracts for insurance were entered into, *see id.* ¶ 19 (FleetCare Corporation was "organized on or about May 5, 2005"), and there is no allegation in the First Amended Complaint that FleetCare Corporation ever became a party to these contracts or otherwise assumed FleetCare Group LLC's responsibilities under the contracts even though it is alleged, "[u]pon information and belief, [that] the assets of FleetCare LLC, including the premiums paid by Plaintiffs, were transferred or otherwise converted to FleetCare Corp. before or about late April 2005 ..." *Id.* ¶ 20.

**16.** The nature of the relationship between CHS/Palmetto as third-party administrator of the FleetCare Plan and Plan participants such as the Individual Plaintiffs is nowhere explained in the First Amended Complaint.

tionship between the Individual Plaintiffs and all of the Defendants. Rather, the breach of contract claim is based on the agreement reached on October 15, 2004, between FleetCare LLC and the Seifts Plaintiffs, on behalf of the Individual Plaintiffs, and which was "verified and substantiated" by subsequent written documents. There are insufficient factual allegations to support the existence of a contract between the Individual Plaintiffs and any of the other Defendants.

Accordingly, to the extent that damages may be assessed against Defendants in light of their default, the damages for breach of contract may only be assessed against Defendant FleetCare Group LLC.

### Breach of Implied Contract, Unjust Enrichment, Quantum Meruit, Breach of the Covenant of Good Faith and Fair Dealing, Conversion

 "Under New York law, quasi-contractual ... relief is unavailable where [as here] an express contract covers the subject matter." *Karmilowicz v. Hartford Fin. Servs. Grp.*, 494 Fed.Appx. 153, 157 (2d Cir.2012) (internal quotation marks and citations omitted). Likewise, under New York law, a plaintiff cannot assert claims for breach of the covenant of good faith and fair dealing and conversion predicated upon the same facts as a breach of contract. *Id.* at 158. Therefore, because the factual allegations underlying all of these claims are the same as those underlying the Individual Plaintiffs' claim for breach of contract, *i.e.*, the "defendants" accepted the Individual Plaintiffs' health insurance premiums but failed to provide health insurance in return, they may not recover damages on these causes of action.[17]

### Fraud

 Despite the heading in their Supplemental Memorandum of Law that "Common Law Authorizes this Court to Award Plaintiffs Damages on the Fraud Fifth Cause of Action and the Breach of Contract/Implied Contract Sixth and Ninth Causes of Action," Supp. Mem. of Law at 5, the Individual Plaintiffs proceed to discuss only how they have alleged a claim for breach of contract. *Id.* ("Plaintiffs allege that there was an offer of health insurance coverage, acceptance of the offer via premium payment, and damages resulting from the breach in the failure to provide the insurance after the premiums were paid."). "To assert a fraud cause of action, under New York law, a plaintiff must allege: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Nwagboli*, 2009 WL 4797777, at *5 (internal quotation marks and citation omitted). In the First Amended Complaint, the Plaintiffs allege that "the defendants or their agents made misrepresentations that they knew or should have known were false to induce the plaintiffs to enter into the contract. The defendants falsely and fraudulently represented that they would provide medical coverage and claim benefits according to the Plan." First Am, Compl. ¶ 114; *see also id.* ¶¶ 115–18. However, "a cause of action for fraud cannot exist when the fraud claim arises out of the same facts as a breach of contract claim with the sole additional allegation that the defen-

---

**17.** Indeed, the Individual Plaintiffs state that they are "entitled to damages against Defendants for return of their premium payments under a theory of quantum meruit/unjust en- richment" if "the Court finds there was no valid insurance contract." Supp. Mem. of Law at 4.

dant never intended to fulfill its express contractual obligations." *Nwagboli,* 2009 WL 4797777, at *5 (internal quotation marks and citation omitted). Here, that is exactly the nature of the misrepresentation alleged—the "defendants" promised to provide medical coverage if the plaintiffs contracted to join the FleetCare Plan and pay premiums, and then the "defendants" failed to hold up their end of the bargain.

■ In any event, even if the Individual Plaintiffs' fraud claim was not deemed duplicative of their breach of contract claim, the claim still fails because they do not plead fraud with the requisite particularity. "The Second Circuit has explained that, for a fraud claim 'to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Golden Archer Invs., LLC v. Skynet Fin. Sys.,* 2012 WL 123989, at *7 (S.D.N.Y. Jan. 3, 2012) (quoting *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir.2006) (citation and internal quotation marks omitted)). The Individual Plaintiffs nowhere plead which specific fraudulent statements were made to them, by whom, or where and when they were made.

Consequently, the Individual Plaintiffs cannot assert a claim for fraud and cannot recover damages on this claim.

### Intentional Infliction of Emotional Distress

■ To state a claim for the intentional infliction of emotional distress, a plaintiff must allege "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."

*Howell v. N.Y. Post Co., Inc.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). The conduct must be so outrageous and extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (internal quotation marks and citations omitted). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999) (citations omitted).

■ The Individual Plaintiffs contend that "the misrepresentation of the availability of health insurance in return for the payment of premiums rises to that level of outrageous conduct that is actionable under this cause of action." Supp. Mem. of Law at 7–8. Accepting the allegations in the First Amended Complaint as true, the Court does not agree that the alleged conduct is sufficiently "extreme and outrageous" to state a claim for intentional infliction of emotional distress. As explained above, at base, the Individual Plaintiffs' case is about the breach of a contract for health insurance, and an intentional breach of contract is not "extreme and outrageous" conduct. *See Nwagboli,* 2009 WL 4797777, at *5 ("The facts present a routine contract dispute, where one contracting party breached the agreement intentionally. Without more, this conduct cannot be deemed 'truly egregious.'"). Accordingly, the Individual Plaintiffs cannot recover damages on this cause of action.

### New York Insurance Law § 3224–a (The "Prompt Pay Law")

■ There is a private right of action under New York Insurance Law § 3224–a,

also known as the "Prompt Pay Law." *Maimonides Med. Ctr. v. First United Am. Life Ins. Co.*, 35 Misc.3d 570, 575, 941 N.Y.S.2d 447 (N.Y.Sup.2012); *see Josephson v. United Healthcare Corp.*, No. 11–CV–3665, 2012 WL 4511365 (E.D.N.Y. Sept. 28, 2012). The Prompt Pay Law "provides that where an insurer is clearly liable to pay a health care claim, the health care provider or patient must be paid within 30 days of receipt of an electronically transmitted claim, or within 45 days of receipt of a claim transmitted by any other means (Insurance Law § 3224–a[a] )," and "[a]n insurer that fails to abide by these standards 'shall be obligated to pay to the health care provider or person submitting the claim' the full amount of the claim plus interest at the statutorily authorized rate (Insurance Law § 3224–a[c][1] )." *Maimonides Med. Ctr.*, 35 Misc.3d at 572, 941 N.Y.S.2d 447.

■ The First Amended Complaint alleges that

the plaintiffs repeatedly contacted both FleetCare and CHS/Palmetto in an effort to get claims processed correctly and paid promptly. Those efforts were ignored by the defendants. The plaintiffs also submitted claims to the defendants for adjudication and payment, exhausting internal administrative remedies. The claims were either not processed or ignored. The defendants never advised the plaintiffs of the Plan's claim appeal process. After several weeks, turning into months, it started to become clear to Seifts, and to other plaintiffs, that any further efforts at attempting to have the defendants adjudicate and pay the plaintiffs' medical claims would be futile. The defendants were refusing to pay the claims, ignoring the claims, and utilizing the premium payments for pur-

poses other than to provide medical benefits to the Plan participants.

First Am. Compl. ¶ 86.

Although the factual allegations, accepted as true, state a claim for violation of New York's Prompt Pay Law, the law only applies to "health care claims submitted under contracts or agreements." N.Y. Ins. Law § 3224–a. Because, as explained above, the Individual Plaintiffs are only alleged to have had a contract with Fleet-Care Group LLC, the Individual Plaintiffs can only assert a claim under the Prompt Pay Law against that Defendant. *See* Docket # 81 (9/30/11 Opinion & Order) at 12, 2011 WL 4542905 ("Because the Court has found that TIG did not enter into an agreement with plaintiffs, was not the underwriting insurer of the Plan, and otherwise had no contact with the plaintiffs, plaintiffs' claims that TIG violated New York Insurance Law § 3224–a and New York General Business Law § 349 must be dismissed. *See* N.Y. Ins. Law § 3224–a (applicable to 'health care claims submitted under *contracts or agreements*' (emphasis added)); N.Y. Gen. Bus. Law § 349 (applicable to '[d]eceptive acts or practices in the conduct of any business').").

### New York General Business Law § 349

■ New York General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," and provides for a private right of action to be brought by "any person who has been injured by reason of any violation of this section." N.Y. Gen. Bus. Law §§ 349(a), (h). To state a claim under N.Y. GBL § 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521

(2d Cir.2000) (citation omitted). Here, the Individual Plaintiffs allege that unspecified "Defendants" engaged in deceptive acts by representing in brochures and the applications for medical insurance coverage that they would provide health insurance to the Individual Plaintiffs in exchange for their payment of premiums and that such representations were misleading in a material way in that no such health insurance was going to be provided. Supp. Mem. of Law at 9–10. Furthermore, the deceptive acts complained of occurred in New York, as all of the Individual Plaintiffs were New York residents during the relevant time period, and they both received the informational materials and applications for the Fleet-Care Plan and paid their premiums in New York. As a result of the deceptive acts, the Individual Plaintiffs suffered financial damages, including the loss of the premiums they paid.

Accordingly, the Individual Plaintiffs may recover damages on their N.Y. GBL § 349 claim. However, the allegations do not support the recovery of damages on this claim from all Defendants. Rather, the claim as alleged by the Individual Plaintiffs only supports the recovery of damages from Defendant FleetCare Group LLC since, as alleged in the First Amended Complaint, the "written documents" received by the Individual Plaintiffs, which contained the deceptive representations, "verified and substantiated" the agreement between FleetCare Group LLC and the Individual Plaintiffs. First Am. Compl. ¶ 62.[18]

### The Adequacy of the Individual Plaintiffs' Submissions in Support of Damages

Having determined that the Individual Plaintiffs may proceed to recover damages

from Defendant FleetCare Group LLC on their claims for breach of contract and violations of New York Insurance Law § 3224–a and New York General Business Law § 349, the Court proceeds to an assessment of the adequacy of the Individual Plaintiffs' submissions in support of their claims for damages and a determination of those damages. Not all of the Individual Plaintiffs have provided a submission in support of an award of damages. Rather, counsel for the Individual Plaintiffs stated that they were "unable to contact and/or locate individual Plaintiff[s] Charles Hargreaves, Selma Denmark, Carolyn Michelle [sic], Diane Berman and John Gerson." Rivera Decl. (Docket # 107) ¶ 3. In the absence of any evidence regarding the amount of damages sought by these Individual Plaintiffs, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiffs Hargreaves, Denmark, DeMichelle, Berman, and Gerson are not entitled to any award of damages. In addition, although counsel for the Individual Plaintiffs did not include Linford Snyder in the list of plaintiffs whom they were unable to contact and/or locate, he likewise has not provided any submission to the Court regarding damages. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff Linford Snyder is not entitled to any award of damages.

 "Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed." *Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 511 (2d Cir.1994) (citations omitted). Despite the different legal claims asserted, the affidavits submitted by the

---

**18.** Whatever communications the Seifts Plaintiffs might have had with any of the other Defendants in connection with the establishment of the FleetCare Plan, to extent that

these communications could be considered deceptive acts or practices, the Individual Plaintiffs were not a party thereto, and they cannot recover damages based on them.

remaining Individual Plaintiffs all seek the same damages, namely, recovery of any insurance premiums and any medical bills that they paid during the period in which they were participants in the FleetCare Plan and arguably should have been receiving healthcare coverage. *See* Affidavits of Individual Plaintiffs, Docket ## 108–13, 157–61; *see also* Supp. Mem. of Law at 11–12 (The Individual Plaintiffs "seek the damages as set forth in their affidavits or a hearing on damages, together with such other and further relief as the Court may deem just and proper."). As noted by the Individual Plaintiffs in their Supplemental Memorandum of Law, see Supp. Mem. of Law at 6, these damages are recoverable on a claim for breach of contract, since damages on such a claim "are determined by calculating the amount necessary to put the plaintiff in the same economic position he [or she] would have been in had the defendant fulfilled his [or her] contract." *RGI Brands LLC,* 2013 WL 1668206, at *6 (internal quotation marks and citations omitted). Accordingly, the Court addresses the issue of damages based solely on the breach of contract claim.[19]

Each Individual Plaintiffs affidavit in support of his or her application for damages shall be discussed in turn.

### Ellen Manfredo

Manfredo, who at all relevant times was self-employed as a massage therapist, procured medical insurance through CAG's insurance plan for self-employed individuals, FleetCare CU 1000P Medical Program ("FleetCare Plan"). Manfredo Aff., 8/27/13 (Docket # 158) ¶¶ 2–3.[20] Manfredo joined the FleetCare Plan in late 2004, and states that she paid $314 per month in premiums. *Id.* ¶ 4. Manfredo claims that she paid the premiums directly to CAG by money order for the months of October, 2004, through April, 2005, for a total of $1,884 in payments. *Id.* However, Manfredo provides no documentary evidence of these payments. In any event, to the extent that the premiums were paid, in the first instance, to CAG, there is no basis to recover these monies from Defendant FleetCare Group LLC since no proof has been provided that CAG forwarded Manfredo's premium payments to FleetCare Group.

Manfredo also seeks to recover amounts that she had to pay to her medical providers when the FleetCare Plan failed to pay her medical bills. Manfredo Aff. ¶ 6. Manfredo lists the medical providers, dates of service, and billing amounts and avers that "copies of the bills and respective proof of payment" are attached to her affidavit as Exhibit B. *Id.* She further declares that

---

**19.** The only other damages sought by the Individual Plaintiffs in their Supplemental Memorandum of Law are treble damages up to one thousand dollars ($1,000) under New York General Business Law § 349. *See* Supp. Mem. of Law at 10 (quoting N.Y. GBL § 349(h) ("The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section.")). Accepting as true the allegation that Defendant FleetCare Group LLC represented in brochures and the applications for insurance that it would provide health insurance to the Individual Plaintiffs in ex-

change for their payment of premiums, when in fact no such health insurance was going to be provided, the Court finds that FleetCare Group LLC willfully violated Section 349, allowing for the award of up to an additional $1,000 in damages to each of the Individual Plaintiffs.

**20.** The Court notes that there are a few differences between the affidavit originally provided by Manfredo on March 21, 2012, Docket # 112, and the affidavit provided by Manfredo on August 27, 2013. The Court relies on the more recent affidavit in this Report and Recommendation.

these amounts "were actually submitted to the Defendants under the terms of the Fleetcare health insurance plan paid through CAG to Fleetcare," and they "demonstrate the medical expenses actually incurred during the time I was an insured of the Fleetcare plan provided by the Defendants and the medical expenses above were in fact paid by me." *Id.* ¶ 7.

The billing amounts for Westchester Pathology Associates and Quest Diagnostics, $217 and $160.75, respectively, are evidenced by collection notices seeking payment. *Id.* ¶ 6 & Ex. B. However, it appears that Manfredo has double-counted the Quest Diagnostics bill for $160.75 as having been incurred on both January 18, 2005, and November 28, 2005. *See id.* Ex. B, p. 2 (collection notice dated November 28, 2005, is for $160.75 bill charged by Quest Diagnostics on January 18, 2005). With respect to the amounts attributed to bills from Mount Kisco Medical Group ("MKMG") for the dates December 20, 2004 ($389), January 18, 2005 ($35 and $1,296), and February 15, 2005 ($330), the bills provided evidence only the $389 charge incurred on December 20, 2004; a charge of $1,252 incurred on January 18, 2005; and the charge of $330 incurred on February 15, 2005. *See id.* Ex. B (1/15/08 statement from MKMG). There is nothing in the MKMG bills evidencing a separate $35 charge incurred on January 18, 2005, or the $44 differential between the $1,296 claimed by Manfredo and $1,252 on the billing statement. Thus, the MKMG bills evidence charges incurred by Manfredo totaling $1,971.

Accordingly, based on the evidence presented to the Court, I conclude, and respectfully recommend that Your Honor should conclude, that Manfredo should be awarded damages in the amount of $2,348.75, plus an additional $1,000, *see* footnote 19, *supra,* or a total of $3,348.75, from Defendant FleetCare Group LLC.

### *Peter Audet*

Audet, who at all relevant times was self-employed in sales and marketing, procured medical insurance through the FleetCare Plan offered by CAG. Audet Aff., 8/14/13 (Docket # 157) ¶¶ 2–3.[21] Audet joined the FleetCare Plan in late 2004, and states that to the best of his recollection, he paid $598 per month in premiums for a family plan. *Id.* ¶ 4. Audet claims that he paid the premiums directly to CAG for the months of December, 2004, through April, 2006, for a total of $9,568 in payments. *Id.* Audet attaches copies of checks that evidence his payment of premiums to CAG, but one of the checks is for $398, two of the checks are for $389, and all of the checks provided total only $5,960. *See id.* Ex. A.[22] Nonetheless, because Audet has only provided proof of payment of premiums to CAG, and no evidence that CAG forwarded his premium payments to Defendant FleetCare Group LLC, there is no basis for Audet to recover such amounts as damages from FleetCare Group.

Audet also seeks to recover amounts that he had to pay to his medical providers when the FleetCare Plan failed to pay his medical bills. *Id.* ¶ 7. Audet lists the medical providers, dates of service, and billing amounts and states that "copies of the bills

---

21. The Court notes that there are a few differences between the affidavit originally provided by Audet on March 21, 2012, Docket # 108, and the affidavit provided by Audet on August 14, 2013. The Court relies on the more recent affidavit in this Report and Recommendation.

22. A $50 check made out to certain doctors (the Court cannot read the handwriting on the check) was included in Exhibit A, but the Court did not include it in its calculation of premiums paid.

and respective proof of payment" are attached to his affidavit as Exhibit C. *Id.* He further declares that these amounts "were actually submitted to the Defendants under the terms of the Fleetcare health insurance plan paid through CAG to Fleetcare," and they "demonstrate the medical expenses actually incurred during the time my family and I were insured's [sic] of the Fleetcare plan provided by the Defendants and the medical expenses above were in fact paid by me on or about the above dates." *Id.* ¶ 9.[23] The billing amounts for Putnam Hospital/Health Quest of $130.93 and $193 are evidenced by collection notices, *id.* Ex. B, as well as invoices. *Id.* Ex, C. The billing amounts of Dr. Saleem Choudhry of $654.55 and LabCorp of $1,466 are also evidenced by invoices. *Id.* Ex. C. Audet also provides copies of checks evidencing payments to his medical providers. However, the checks for doctor's visits on February 24, 2005, and March 14, 2005, of $40.80 and $30, respectively, are dated, on the checks, "2/24/04" and "3/14/04." *Id.* Ex. C (emphases added). Because those checks bear numbers subsequent to the check paid on January 3, 2005, to LaGrange Physical Therapy, the Court assumes Audet simply misdated these two checks. In all, Audet incurred medical expenses of $2,794.28.

Accordingly, based on the evidence presented to the Court, I conclude, and respectfully recommend that Your Honor should conclude, that Audet should be awarded damages in the amount of $2,794.28, plus an additional $1,000, see footnote 19, *supra*, or a total of $3,794.28, from Defendant FleetCare Group LLC.

**23.** The ninth paragraph in the affidavit is erroneously numbered "7."

**24.** The Court notes that there are a few differences between the affidavit originally provided by Hoyt on March 23, 2012, Docket # 111,

### Susan E. Hoyt

Hoyt, who at all relevant times was self-employed as a real estate broker, procured medical insurance through the FleetCare Plan offered by CAG. Hoyt Aff. (8/13/13, Docket # 161) ¶¶ 2–3.[24] Hoyt states that she joined the FleetCare Plan in September, 2004, and that she made premium payments to CAG on a quarterly basis of $942. *Id.* ¶ 4. Hoyt states that she remained a member of the FleetCare Plan "without interruption" through December, 2005. *Id.*

Hoyt also seeks to recover amounts that she had to pay to her medical providers when the FleetCare Plan failed to provide her with healthcare coverage. *Id.* ¶¶ 5–6. Hoyt lists checks, including the dates of the checks and the check numbers, that she paid to medical providers for office visits, as well as to CAG for premiums, and provides a copy of bank statements "showing proof of payment," although the "statements provided do not reflect an actual copy of the check or to whom the check is made payable to [sic]." *Id.* ¶ 5 & Ex. A. She avers that these amounts "were actually submitted to the Defendants under the terms of the Fleetcare health insurance plan paid through CAG to Fleetcare," and they "demonstrate the medical expenses actually incurred during the time I was an insured of the Fleetcare plan provided by the Defendants and the medical expenses above were in fact paid by me on or about the above dates." *Id.* ¶ 7. The bank statements, for the most part, reflect the month and day (but not the year) and the numbers of the checks, as well as their dollar amounts, as listed in Hoyt's affidavit. *Id.*

and the affidavit provided by Hoyt on August 13, 2013. The Court relies on the more recent affidavit in this Report and Recommendation.

¶ 5 & Ex. A.[25] In addition, there is one entry in the bank statements reflecting a debit transaction listed next to the date 10/18, without stating the year (which the affidavit states was 2004), and noting that the amount of $116 was charged to the account on October 15 to pay Mid Hudson Medical Group, Fishkill, NY. *Id.* Ex. A.

However, to the extent that the checks were for payment of premiums to CAG, there is no basis for Hoyt to recover these monies from Defendant FleetCare Group LLC given the absence of proof that CAG forwarded Hoyt's premium payments to FleetCare Group. Furthermore, to the extent that Hoyt seeks to recover for medical bills paid on September 26, 2004 ($170 paid to Fishkill OBGYN) and October 18 (or October 15), 2004 ($116 paid to Mid Hudson Medical Group), there is no basis for the Court to conclude that Hoyt was covered by the FleetCare Plan as early as September, 2004. Although Hoyt states that she joined the Plan in September, 2004, the First Amended Complaint alleges that "[f]inal agreement was reached on all material terms of the Plan no later than October 15, 2004," First Am. Compl. ¶ 61, and then subsequently refers to "the binding nature of the agreement reached on October 15, 2004," *id.* ¶ 64, but then alleges that "[t]he effective start date for the Plan was November 1, 2004." *Id.* ¶ 67. Thus, there is no basis for the recovery of medical expenses incurred prior to November 1, 2004.[26]

Accordingly, based on the evidence presented to the Court, I conclude, and respectfully recommend that Your Honor should conclude, that Hoyt should be awarded damages in the amount of $295, plus an additional $885, *see* footnote 19, *supra,* or a total of $1,180, from Defendant FleetCare Group LLC.

### *Maryann Pulvirenti*

Pulvirenti, who at all relevant times was self-employed as a real estate broker, procured medical insurance through the FleetCare Plan offered by CAG. Pulvirenti Aff. (8/20/13, Docket # 159) ¶¶ 2–3.[27] Pulvirenti joined the FleetCare Plan and states that to the best of her recollection, she paid $359 per month in premiums. *Id.* ¶ 4. Pulvirenti claims that she paid the premiums to CAG for the months of November, 2004, through November, 2005, for a total of $4,308 in payments. *Id.* Pulvirenti states that attached to her affidavit as Exhibit A "is a copy of checks as proof of payment, and the roster of CAG for the months that I was not able to locate checks for." *Id.* The attached copies of checks that evidence her payment of premiums to CAG (a couple of the checks are made payable to J.C. Seifts) are for the months of January, 2005, through November, 2005, however, one of the eleven checks is for $319 instead of $359. *Id.* Ex. A. No "roster of CAG" is attached to her affidavit for the months of November and December, 2004, but Jeffrey Seifts has provided a declaration to the Court to which he has attached CAG customer rolls

---

25. The two exceptions are that the first check listed in the affidavit, check number 2567, is said to be dated September 26, 2004, but the bank statement says, "9/29," and the bank statements provided do not evidence check number 2683 dated February 8, 2005, for $942. *See* Hoyt Aff. Ex. A.

26. Even if Hoyt sent her first premium payment to CAG on October 1, 2004, *see* Hoyt

Aff. ¶ 5, that does not prove that she was covered by the FleetCare Plan as of that date.

27. The Court notes that there are a few differences between the affidavit originally provided by Pulvirenti on March 20, 2012, Docket # 113, and the affidavit provided by Pulvirenti on August 20, 2013. The Court relies on the more recent affidavit in this Report and Recommendation.

for the months of October, 2004, through February, 2005. *See* Seifts Decl. (Docket # 160) ¶ 3 & Attachment. Although Seifts provides almost no information to aid in the Court's interpretation of these customer rolls, they appear to list CAG members who were participating in the FleetCare Plan during those months.[28] The Court has looked at the CAG customer rolls attached to the Seifts Declaration and found Pulvirenti listed in November, 2004, under "Advantage (Single)," and listed in December, 2004, under "Advantage Plus (Single)." Docket # 160–1. However, these customer rolls do not list dollar amounts received as premiums from the listed customers. Accordingly, Pulvirenti has provided proof of payment of $3,909 in premiums to CAG. However, because she has only provided evidence of payment of premiums to CAG, without proof that CAG forwarded Pulvirenti's premium payments to Defendant FleetCare Group LLC, there is no basis for her to recover such amounts as damages from FleetCare Group.

Pulvirenti also seeks to recover amounts that she had to pay to her medical providers when the FleetCare Plan failed to pay her medical bills. *Id.* ¶ 9. Pulvirenti lists the medical providers, dates of service, and billing amounts and states that "copies of the bills and respective proofs of payment" are attached to her affidavit as Exhibit C. *Id.* She further declares that these amounts "were actually submitted to the Defendants under the terms of the Fleetcare health insurance plan paid through CAG to Fleetcare," and they "demonstrate the medical expenses actually incurred during the time I was an insured of the

Fleetcare plan provided by the Defendants and the medical expenses above were in fact paid by me." *Id.* ¶ 11. However, the first item listed in Pulvirenti's affidavit is a $500 medical bill from Vassar Brothers Medical Group covering services provided on August 10, 2004. *Id.* Because, as explained above, the First Amended Complaint alleges that the effective start date for the FleetCare Plan was November 1, 2004, First Am. Compl. ¶ 67, there is no basis for the Court to award damages for medical expenses incurred prior to that date. The other expenses incurred in connection with treatment by Vassar Brothers Medical Group, as evidenced by billing statements in the amounts of $1,240, $600, and $1,302.74, do fall within the period in which Pulvirenti was covered by the FleetCare Plan and may be included in the award of damages recommended herein.

The billing amounts for Dr. Kristina Otero, Dr. Robert Dianni, and Dr. Ruben Delgado are evidenced by Health Insurance Claims Forms which appear to have been submitted to CAG. *Id.* ¶ 9 & Ex. C.[29] Likewise, the billing amounts attributed to Hudson Valley Urology are evidenced by billing statements—a billing statement dated May 23, 2006, for $253.35, and a billing statement dated July 18, 2006, for $343.35. *Id.* Ex. C. However, these billing statements appear to include a number of the same charges for services provided on June 17, 2005, and July 5, 2005, and the July 18, 2006, billing statement also includes charges for office visits which occurred on June 12, 2006, and June 20, 2006, when Pulvirenti was no longer cov-

---

**28.** It is unclear to the Court how there could be CAG customer rolls reflecting enrollment in the FleetCare Plan during the month of October, 2004, when Plaintiffs allege in the First Amended Complaint that the effective start date for the FleetCare Plan was November 1, 2004. *See* First Am. Compl. ¶ 67.

**29.** One of the Health Insurance Claims Forms attributed to Dr. Dianni for a $141 charge incurred on March 2, 2005, was actually seeking payment for healthcare services provided by Dr. Narendra P. Patel. Pulvirenti Aff. Ex. C.

ered by the FleetCare Plan. *Id.* Accordingly, the Court will include only the $253.35 billing amount in its calculation of damages.

Pulvirenti also provides copies of checks to evidence payment of $30 and $250 to Orange Pathology, and $125 to American Partners in Anesthesia. *Id.*[30] Although Pulvirenti provides a copy of a check for $50 which she states is for services rendered by Hudson Valley Radiology on August 4, 2005, when she was covered by the FleetCare Plan, the check is made payable to CAG Ltd. Without proof that this $50 was in turn forwarded to Defendant Fleet-Care Group LLC, there is no basis to include this amount in the calculation of damages. There is no documentary evidence provided regarding either the $189 medical bill from Hudson Valley Radiology for services provided on February 15, 2005, or the $350 medical bill from Riverside Women's Health for services provided on June 15, 2005, *see id.* ¶ 9, and thus, the Court lacks a sufficient basis for including these amounts in its damages calculation.[31]

Accordingly, based on the evidence presented to the Court, I conclude, and respectfully recommend that Your Honor should conclude, that Pulvirenti should be awarded damages in the amount of $4,886.09, plus an additional $1,000, *see* footnote 19, *supra,* or a total of $5,886,09, from Defendant FleetCare Group LLC.

### Joseph French

French, who at all relevant times was self-employed as the owner of an entertainment business, procured medical insurance through the FleetCare Plan offered by CAG. French Aff. (3/22/12, Docket # 110) ¶¶ 2–3. French joined the Fleet-Care Plan in late 2004, and states that to the best of his recollection, he paid $250 per month in premiums for himself and his late wife. *Id.* ¶ 4. French claims that he paid the premiums directly to CAG for the months of November, 2004, through December, 2005, for a total of $3,500 in payments. *Id.* However, French states that he is "unable to locate proof of these payments." *Id.* n. 1. In any event, to the extent that the premiums were paid, in the first instance, to CAG, there is no basis to recover these monies from Defendant FleetCare Group LLC given the absence of proof that CAG forwarded French's premium payments to FleetCare Group.

French also seeks to recover amounts that he had to pay to his medical providers when the FleetCare Plan failed to pay his medical bills. French Aff. ¶ 6. French lists the "providers and their billing amounts which were incurred and paid during the time my family was 'insured' by Fleet-care," and he states that attached to his affidavit are "copies of the bills which indicate when they were paid." *Id.* ¶ 6 & Ex. A.[32] Based on the attached statements from Dr. Glenn Schwartz and Dr. Robert Fafalak, French claims a total of $6,225 in

---

30. Although the checks were written in 2006, the checks for Hudson Valley Radiology and Orange Pathology bear notations that they are payment for services rendered in August and September, 2005, when Pulvirenti was covered by the FleetCare Plan. Although the check to American Partners in Anesthesia notes that it is a payment for services rendered on 9/20/06, the check itself is dated 2/22/06, so it must have been for services rendered on 9/20/05, when Pulvirenti was covered by the FleetCare Plan.

31. To the extent that the failure to provide evidence of these medical bills was inadvertent, Pulvirenti should submit such evidence in any objections to this Report and Recommendation that she might file.

32. Only the statements evidencing bills for services provided by Dr. Robert Fafalak note a "Paid Date." *See* French Aff. Ex. A.

medical expenses. However, included in the billing statement for Dr. Glenn Schwartz are charges for services provided on October 18, 2004, in the total amount of $250. *Id.* Ex. A. As previously noted, because the First Amended Complaint alleges that the effective start date for the FleetCare Plan was November 1, 2004, First Am. Compl. ¶ 67, there is no basis for the Court to award damages for medical expenses incurred prior to that date.

Accordingly, based on the evidence presented to the Court, I conclude, and respectfully recommend that Your Honor should conclude, that French should be awarded damages in the amount of $5,975, plus an additional $1,000, *see* footnote 19, *supra,* or a total of $6,975, from Defendant FleetCare Group LLC.

### John Bastone

Bastone, who at all relevant times was self-employed as a salesperson, procured medical insurance through the FleetCare Plan offered by CAG. Bastone Aff. (3/21/12, Docket # 109) ¶¶ 2–3. Bastone signed up for a family plan in late 2004, and states that he initially paid $916 to join the FleetCare Plan and paid $719 per month in premiums. *Id.* ¶ 4. Bastone paid the premiums directly to CAG for the months of December, 2004, through September, 2005, for a total of $7,387 in payments. *Id.* Bastone attaches copies of checks that evidence his payment of premiums to CAG. *Id.* Ex. A. Review of these checks shows that the initial payment in December, 2004, was for $961, that the subsequent monthly payments (except for the months of May, June, and July, 2005)[33]

were for $719, but that in October, 2005, Bastone made a payment to CAG of $768. *Id.*[34] Nonetheless, because Bastone has only provided proof of payment of premiums to CAG, and no evidence that CAG forwarded his premium payments to Defendant FleetCare Group LLC, there is no basis for Bastone to recover such amounts as damages from FleetCare Group.

Bastone also seeks to recover amounts that he had to pay to his medical providers when the FleetCare Plan failed to pay his medical bills. *Id.* ¶ 5. Bastone lists the medical providers, dates of service, and billing amounts and states that he has provided "copies of the bills and respective proofs of payment" for the itemized amounts set forth in his affidavit, *id.* ¶ 5 & Ex. B, but notes that he only "provided copies of all the bills/proof of payment in [his] possession." *Id.* ¶ 5 n. 1.

Some of the items listed in Bastone's affidavit—medical bills from Bone & Joint Associates for $804.96, $763.20, and $5,150.80, and from Quest Diagnostics for $80—are bills covering services provided in November, 2004. *Id.* ¶ 5 & Ex. B.[35] Although Bastone does not himself provide any evidence that he was covered by the FleetCare Plan prior to December, 2004, the Court has looked at the CAG customer rolls attached to the Seifts Declaration. *See* Docket # 160–1. "Bastone, John J. & Margaret A." are listed under "Advantage Plus (Husband/Wife)" for the months of October, 2004, through January, 2005 (and presumably February, 2005–2 pages of the customer rolls that have been submitted

---

**33.** As Bastone notes in his affidavit, he was "unable to locate checks for premium payments for the month[s] of May through July," although he "duly attest[s] that [he] paid these months." Bastone Aff. ¶ 4 n. 1.

**34.** The February, 2005, check was actually made payable to J.C. Seifts and Co., and the

April, 2005, check was erroneously dated 3/10/05. Bastone Aff. Ex. A.

**35.** Only the first page of the bill for $5,150.80 has been provided to the Court. *See* Bastone Aff. Ex. B.

for February, 2005, are missing). *See id.* Thus, there is evidence that Bastone was covered by the FleetCare Plan in November, 2004. These billing amounts, in addition to the billing amount for Bone & Joint Associates of $201.40 and the billing amount for Quest Diagnostics of $27.72, are evidenced by collection notices and invoices. *Id.* Ex. B.

A bill from Quest Diagnostics for $70 is for medical services provided on November 15, 2005. *Id.* Ex. B. Because Bastone does not provide any evidence that he was covered by the FleetCare Plan after September or October, 2005 (assuming that the above-noted check from October, 2005, for payment of $768 to CAG extended insurance coverage through the end of that month), the Court will not consider this dollar amount as part of any recommended award of damages.

Finally, Bastone provides copies of checks reflecting payments that he made to his medical providers. A number of these checks date from the period during which Bastone was covered by the Fleet-Care Plan—a March 7, 2005,[36] check to Quest Diagnostics for $133.76, an August 12, 2005, check to Dr. Camisr for $80, and an October 31, 2005, check to Bone & Joint Associates for $1,710. *Id.* Ex. B. Bastone also provides copies of checks to Quest Diagnostics written after October, 2005—checks for $80,[37] $75, $57.75, and $498.75—without stating when the services in ques-

tion were rendered; however, Bastone states in his sworn affidavit that these billing amounts were incurred during the time period in which his family was covered by the FleetCare Plan. *Id.* ¶ 5.

Accordingly, based on the evidence presented to the Court, 1 conclude, and respectfully recommend that Your Honor should conclude, that Bastone should be awarded damages in the amount of $9,583.34, plus an additional $1,000, see footnote 19, supra, or a total of $10,583.34, from Defendant FleetCare Group LLC.

### *CONCLUSION*

It is regrettable that despite the lengthy pendency of this litigation, the Court is unable to recommend a more significant award of damages, particularly to the Individual Plaintiffs. However, the Court is constrained by the evidence that has been submitted for its consideration.

Based on the foregoing, I conclude, and respectfully recommend that Your Honor should conclude, that a judgment should be entered in this action as follows:

(1) CAG should be awarded damages in the amount of $128,821.73 from Defendants FleetCare Group LLC, FleetCare Corporation, CHS, Worthy, Bart Posey, Angela Posey, and Kirkpatrick;

(2) Manfredo should be awarded damages in the amount of $3,348.75 from Defendant FleetCare Group LLC[38];

---

36. Bastone's affidavit states that this check is from March 1, 2005, but the check itself is dated March 7, 2005. Bastone Aff. ¶ 5 & Ex. B.

37. The copy of the November 14, 2005, check for $80 made payable to Quest Diagnostics is included in Exhibit A, and might be payment in response to the notice from the collection agency for services provided on November 29, 2004.

38. None of the Individual Plaintiffs has sought an award of prejudgment interest, and

the Court declines to recommend one. The First Amended Complaint does not include a demand for prejudgment interest, and its catch-all demand for "such other and further relief as [the Court] deems proper, just and equitable," does not serve as a demand for prejudgment interest. *See Guanghong Int'l (HK) Ltd. v. Ultimate Fin. Solutions LLC,* No. 11 Civ. 4019, 2012 WL 1228085, at *6 (S.D.N.Y. Mar. 26, 2012) (citing *Silge v. Merz,* 510 F.3d 157, 160 (2d Cir.2007)), *adopted by,* 2012 WL 2402902 (S.D.N.Y. June 26, 2012).

(3) Audet should be awarded damages in the amount of $3,794.28 from Defendant FleetCare Group LLC;

(4) Hoyt should be awarded damages in the amount of $1,180 from Defendant FleetCare Group LLC;

(5) Pulvirenti should be awarded damages in the amount of $5,886.09 from Defendant FleetCare Group LLC;

(6) French should be awarded damages in the amount of $6,975 from Defendant FleetCare Group LLC; and

(7) Bastone should be awarded damages in the amount of $10,583.34 from Defendant FleetCare Group LLC.

Based on the failure of the Seifts Plaintiffs to comply with the Court's July 24 Order, the Court declines to recommend an award of attorneys' fees to the Seifts Plaintiffs at the present time. However, the Seifts Plaintiffs may include in any objections to this Report and Recommendation that they might file an explanation of how the factual allegations in the First Amended Complaint satisfy the elements of a claim under either ERISA or the New York General Business Law, such that they might seek an award of attorneys' fees. If Your Honor determines that the Seifts Plaintiffs have satisfied their burden of establishing the liability of any of the Defendants to them under either statute, then you may refer the case back to the undersigned to decide the issue of attorneys' fees.

However, given that the Individual Plaintiffs have sufficiently pled a claim under New York General Business Law § 349 against Defendant FleetCare Group LLC, I conclude, and respectfully recommend that Your Honor should conclude, that the Individual Plaintiffs are entitled to an award of attorneys' fees as provided for in that statute. *See* N.Y. GBL § 349(h). Counsel for the Individual Plaintiffs has not yet submitted an application for attorneys' fees. Accordingly, if Your Honor agrees with this recommendation, then you may refer the case back to the undersigned to decide that application.

## *NOTICE*

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed.R.Civ.P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed.R.Civ.P. 6(d), or a total of seventeen (17) days, *see* Fed.R.Civ.P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Edgardo Ramos, United States District Judge, at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Ramos and should not be made to the undersigned.

Filed March 6, 2014.